This is SAP America v. Wellogix, 2017-11-76. Mr. Lanier, when you're ready. Mr. Court, good morning. Reading the district court's opinion on that issue here, one would not know that Wellogix had accused the prior art of infringement of 60 claims after being told by the patent office that that prior art raised a substantial new question of patentability with respect to those claims. And there are, depending on whether you count the 480 patent, either 59 claims to which what you just said did not apply, or 68 claims to which it doesn't apply. That's correct, Your Honor. It's a 65. Yes. And you did not, in your attorney's fees application, present to the district court, and you certainly don't present here, anything about the specifics of the patent claims. You made an argument that said, look what they alleged as to roughly half of the claims. Look what the PTO ultimately decided. And the district court said, that's not enough to say it's exceptional. Go away. Why is that an abuse of discretion? You did not show it, show the district court, anything about the specifics of the claims and why it was objectively baseless, or anything like objectively baseless, for these claims to have been asserted. Your Honor, three reasons. First of all, the district court clearly erred in finding that this case was not exceptional, because it didn't consider the entire totality of the circumstances. A variety of other facts, in addition to the weakness of the patent claims. It should have done all of that. The patent claim issue is one of the issues. What else is there? First, the extraordinary result. WellLogix, in arguing against DeStay, said the odds are that claims will survive. It would be unlikely, improbable, et cetera. That claims would survive. It was wrong. But it was wrong in a way that invoked the guidance of the Supreme Court in Octane, which is that some cases are so exceptionally weak that they stand out from others. Right, but you can't tell, at least I have difficulty how you can say, that the district court abused its discretion in saying, I don't see the exceptional weakness here based solely on the fact that the patent owner lost in the PTO. We don't think that our argument does not depend solely on the patent owner's loss in the PTO. We do think that is a relevant factor and that the extraordinary result demonstrates the exceptional weakness of the claims. Without further analysis, the district court was aware of what the back and forth was. It received regular reports. But to Your Honor's point, it's not just that argument. We do think it's important, but it's not just that. It was the fact that the prior art was accused, which was. For half the claims, but not for the other half. That's right, Your Honor. But again, this court's precedent is very clear. Not every single argument need to have been bad for there to be a finding of an exceptional case. This court's recent decision in Homeland House was. Your argument is not what's sufficient for there to be a finding, but what is sufficient to compel a finding. That's correct, Your Honor. And we think that's what. Have we ever come close to saying anything like that? Absolutely, Your Honor, in a few different cases. For example, in Homeland House where, so it's a recent decision of this court, cited in the party's papers. The court in that case, the district court, bound against the prevailing party on invalidity, but found for the prevailing party on non-infringement. So the prevailing party below didn't win on everything, but yet still the court properly concluded that there was an exceptional case in that circumstance. The other thing. Did we look at the details of the claims and the claim construction and the arguments? In some of those cases, this court's precedent has done that. They've looked at the details of the arguments. And again, we emphasize that with respect to the accusation of the prior art, that doesn't require much detailed analysis. Requires none. There's no dispute. The Wellogics accused what it knew to be prior art. It had worked with the product. It didn't disclose it in the prosecution. For half of the claims. For half of the claims, absolutely. So they could have proceeded in this litigation, put aside that particular argument, as to the other half of the claims. It would be, in that case, then the case would be different. And our arguments might be different. But that's why the Supreme Court emphasized we considered the totality of the circumstances here. We're talking about the R3 software? Yes. OK. Isn't there different versions of the R3 software? So that maybe by the time of the infringement contention, it was a modified version of the R3 software compared to the deemed prior art version of R3 software? That's a theoretical possibility. But two responses to that, Your Honor. Other than the fact that it's a theoretical possibility. First, Wellogics accused not just R3, but all its subsequent versions. And second, in accusing the known prior art and the other versions under different names, it was called ECC and similar things in the future. If that prior art, if it was prior art that rendered the patent invalid, and then that doesn't change anything else, even if there were other products. So it accused the specific product that was prior art. And it accused the other subsequent versions. Did it accuse it as modified to be software products? What Wellogics did was two things. It did an interrogatory response and then infringement contentions that we subsequently had to move forward more detailed statement of the infringement contentions. That motion was never ruled on because the case was stated. But what it did in the interrogatory response was it gave a long list of software products, over 100 software products that were accused, including R3, for example, just by that name. Then later it did infringement contentions that read against the old R3, exactly the way R3 read against the claims, a subset of the claims that were at issue. Does that address your Honor's question? OK. Thank you, Your Honor. So Judge Taranto, turning back to your questions, again, we emphasize three things. First, that with respect to those claims, the guidance from this court is consistent. The Kartner case cited in our papers is clear that accusing the prior art is, in fact, something that should be considered in the determination of an exceptional case. And how we know the district court abused its discretion is because it didn't even mention that fact in its opinion below. What the district court said in its opinion was SAP says that Wellogic should have known about the prior art. That's a true statement. But that wasn't actually our argument below. And that's not the full extent of the facts that the district court should have considered. The district court should have considered that it accused the prior art after being put on notice by the patent office. Then, going beyond the art, that the R3 raised a substantial new question of patentability with respect to two of the patents. Right, but the substantial question is not a determination about what the result will be of the full. Is this a re-exam or an IPR? These were re-exams. Re-exams of the whole. Right, it's not the final answer by any means. And it ultimately, as Wellogic points out, the ultimately the re-exams invalidated one claims worth of patents based on R3. Does the difference in the burden of proof make any difference? That is, the board gets both on re-exam and IPRs to say, this is unpatentable by a preponderance. Does that make it, let's use the word frivolous subjectively baseless, to assert the claim in litigation where, in order for you to have won on the same invalidity or unpatentability argument in district court, you would have had to meet a higher standard? We don't think that the court needs to determine whether the different standards of proof played in at all here. And that's because our argument is not simply that because they lost, this case was exceptional. That's part of the argument, because as the Supreme Court guides us, that is evidence of the exceptional weakness. The point is that having been put on notice of an issue raised over disagreement, raised by the Patent Office, Wellogic then accused not only R3, but 100 other products of infringement of 120 claims with demonstrating no thought, no care, no concern, and doing nothing in response to the fact that the Patent Office had raised this issue. So again, our argument is not that because the Patent Office identified a question that it later resolved on one patent completely in favor of SAP, that they were legally precluded from asserting it. What was going on in this litigation, in the patent case that we're talking about, from the moment that the re-exam was initiated? Initiated by the PTO, not by the request for it. Sure. There were several different re-examination dates. So in the months leading, that came at different points over a few weeks or a few months. In the few months leading up to the January 4th stay of the case, January 4th, 2011, I believe, in those months, the parties were engaged in the things that parties are in a patent case. Specifically in this case, we were preparing invalidity contentions required under the court's local rules, engaged in discovery on all of the claims and damages and non-infringement, doing all of the standard activities of a patent case up until the time that the case was staked. And when were the last of the re-exam initiation decisions? I believe that was in October of 2010, Your Honor. So from the last until the actual stay. Our motion was filed, I believe, in November. And I believe it was decided in January, or the order issued in January. So there was a couple of month periods on the last. And that's the period of continued litigation for which you're seeking fees? No, Your Honor. We are seeking fees for the activity on the patent case, all of it up to January of 2011. We're not seeking any fees. Oh, so even all of their activity before, as you say, the PTO put them on notice? That's correct, Your Honor. That's right. That's right. And to be very clear, we do not argue that that fact alone is a sufficient basis to compel a finding. But we do believe it compels this court to conclude that the district court clearly erred, because it didn't even weigh that fact. It didn't even mention that fact, as well as the entire totality of the evidence, all the other things that we identified in our pleadings. I note that I'm into my rebuttal time. I had wanted to save a few minutes, unless Your Honor's agreed. You can continue, or you can save it all, as you choose. I'd like to save it, if I may, Your Honors. Thank you. Mr. Melconian. Thank you. May it please the court. Rafi Melconian for the Happily Well Logics. Your Honors, this is a case where SAP initiated this part of the litigation. It sued Well Logics for declaratory judgment with respect to patent infringement. Well Logics did not sue SAP over the patent until it was sued. And where Well Logics prevailed in other parts of this litigation, I want to be clear about that, because this is not the kind of exceptional litigation where Well Logics was trying to hold people up for money or anything like that. We prevailed against Accenture, the co-defendant in this case, in a trade secrets misappropriation matter, and won a verdict of $40 million, which we defended in the Fifth Circuit and in the Supreme Court. So this is not that kind of exceptional case where a small company is trying to green a large company in litigation. And the district court reasonably exercised its ample discretion to find that this case was not exceptional. This is a highly experienced district judge. He lived with the case, and he used his discretion that we see in the opinion. And that judgment should be affirmed. My plan is to address some of SAP's specific claims about what supposedly went wrong below. But of course, wherever the court wants to go, I'm prepared to answer those questions as well. I do want to start with one overarching point, though, that the district court did the multi-point analysis that's required in opting fitness. He lived with this case for six or seven years. I don't want to misstate it. He analyzed the totality of the circumstances. He looked at the objective unreasonableness of our positions or not. Did the district court mention the fact that you all accused a product of infringing that was a prior art product that ended up for half the claims in the PTO invalidating? I think the district court does mention that. He says in one sentence, I think it's on Appendix 7, I think he says, I hope I'm not wrong, that one of SAP's arguments is that we ignored the fact that R3 predated our patents. But let me answer that substantively as well. And it's the point Judge Chen made during the first argument, which is that the 1999 R3 software did predate our patents. But what we were accusing was the 2006 R3 software, post-2006. After our patents were filed. So the idea that we should have known that R3 necessarily anticipated all our patents is incorrect. I don't think that's correct as a matter of the record. Well, you accused R3 of infringing the patents, right? That's right. And the PTO granted re-exam requests, at least a couple of them, based on R3 raising a substantial new question of patentability. Yes, that's correct. So I guess the question is, why wouldn't that put you on high alert that R3, the very product you accused, is actually anticipatory, or potentially anticipatory? Well, I think our argument was that the 1999 version of R3 was not anticipatory. Now, of course, we lost that argument. We accept that with respect to some of the claims. But our position was that by 2006, they had incorporated our inventions into their software and were thus infringing our patents. Now, again, we didn't win that argument. And I understand it wouldn't have been better had we won them. But that doesn't make the case exceptional. It doesn't make it an abuse of discretion to have denied the exception. Can I just double check something? Yes, sir. When you talk about R3, you don't accuse a document. You accuse a product, right? Yes, it's a software product. In the re-exam, I assume that the PTO was talking about a document of some sort, a publication? They were talking, I believe, about the instruction manual. OK, that's a document, right? That's right. So did your accusation of infringement by an actual product that SAP made, used, sold, offered for sale, imported, whatever it is, corresponded to the 1999 instruction manual, if that's what the document was on which the re-exam was initiated? No, Your Honor. We were accusing the current R3 product at the time. And is there anything in the record that tells us whether there were changes between 1999 and 2006, or do we just not know? We don't know, but SAP's brief concedes that there are by noting that there's been developments in the software. It changed its name. I think Mr. Lanier even said so just a few minutes ago. So it's not directly in the record. So the instruction manual presumably changed. Call it this other thing now. Yes, sir. Yeah, it changed. I'm sure there were developments. I mean, I was thinking about it last night. This is a software program where you're supposed to go to a well and do procurements. So the idea that a 1999 instruction manual would have anything to do with a 2006 instruction manual, where you're starting to get handheld computers that can go to the well, do the procurement of the new products, that they would look anything alike seems to me quite unlikely. But it's not in the record that I can point to what exactly the developments were between 1999 and 2006 or 2007 or anything like that. Just to be clear, I don't see anywhere in the district court's decision that calls out the R3 situation from the re-exams. The A7, the judge does point to the fact that it was a lengthy re-exam process, so suggesting that it wasn't such a clear-cut, simple, open-and-shut process. But the judge doesn't actually address the question of whether it was entirely improper for you to allege that R3 is infringing when R3 was prior art. Your Honor, he doesn't use the word R3. I'm confident that in that opinion, he summarizes SAP's argument about what we supposedly did wrong. I may have pointed you to the wrong page. I apologize for that. He doesn't use the word R3. He doesn't describe the whole argument in great detail, although I don't think he's required to. But he had that argument before him. They made that argument in their papers. And I think it's quite clear that he considered it. If I might address briefly some of the non-patent issues that our friends on other sites say exemplify the sort of misconduct or the exceptional nature of the case, for one thing, just as a threshold matter, I don't think that any actions we took in the trade secrets part of this case can properly be considered as a matter of an exceptional case finding under Section 285. For one thing, most of the time, the trade secrets litigation was not part of this same case. They were severed. And so I think just as a matter of procedural rules, you can't consider those in this matter. But even to the extent you do, I think it's perfectly safe for this court to assume as a matter of argument that you can consider them. Nothing went wrong in that litigation that would require an exceptional case finding. If you look at the briefs, our friends on the other side say that we sort of committed misconduct by raising a jurisdictional argument in the trade secrets litigation with respect to the forum selection clause, for example. We were right about that argument. The district court in that case lacked subject matter jurisdiction. No one disputes that. And that was solved by joining it to the patent case. That's right. And that's the basis on which the Fifth Circuit then on appeals rejected the jurisdictional challenge because there was now one case in which there was no need to rely on diversity. That's right. He re-established federal question jurisdiction and then used supplemental jurisdiction to solve the jurisdictional problem. But our point always was, if we had not raised that to the district court, I think we would have been in quite a lot of trouble in the Fifth Circuit because the Fifth Circuit would have found the jurisdictional problem. And so we did what we thought was best, which was raise it to the person who could fix it. And then we had a dispute with other people. Who sought to sever the trade secret claim from the patent case? I think we did. That was you. And then after you successfully got that severed, you came back and said, oh, look, there's no jurisdiction over the trade secret case. Yes, that did happen. I'm not going to say that. So what are we supposed to make of that? I think it's, I don't want to say it this way, but I mean, first of all, the reason it was found at the time it was found, the jurisdictional problem, was that appellate counsel got involved. And we did a jurisdictional analysis, as we always do when we're going up to any court of appeals, to make sure that there's jurisdiction. And that's when we discovered the issue. Why no one noticed it at the time the severance was granted, I can't honestly give you an answer to that. But I think people didn't think about the fact that you create a new case when you sever a case from another, and there needs to be an independent jurisdictional basis. And it was just a mistake that had to be fixed in one way or another. But the fact that we raised it at the time we did, I don't think implies anything bad about what we were doing. One other point, our friends in their briefs, at least, I don't think Mr. Linnier quite got to it, say that we re-litigated certain issues in the two trade secret litigations. Again, we don't agree with that characterization of what happened. There was a 2008 trade secret litigation against Wellogix, excuse me, against SAP, where Judge Ellison, the first district judge, held that the forum selection clause applied in this NetWeaver agreement, and that the proper venue was Germany. We did not do anything after that decision was made. We did not sue SAP. You didn't appeal that decision, is that right? We did not appeal that decision. Then they sued us in Texas. And then you asserted that by their suit, they've now waived the forum selection clause, and that argument ultimately was rejected. It was rejected, but I thought it was a good faith argument. We thought it was a good faith argument. It was not. No court to deal with it said it was frivolous or meritless. They said we were wrong, and that happens. So in that second litigation, we did not try to re-litigate the things Judge Ellison had decided. We did not try to re-litigate whether the forum selection clause was valid or whether it had been entered into as a contract of adhesion or anything like that. And we did not attack Judge Ellison's other main opinion, which was that it covers both SAP America and SAP AG. That would have been subject to the first appeal, which was not taken. So all we argued in that second go around, our main argument was there's been waiver. So I don't think that that could possibly be something the district court was required as a matter of his discretion to grant a exceptional case finding. Other than that, with respect to the patents, I want to make one additional point. Most of these patents had nothing to do with R3. So I think by the time we get to their reply brief, it's clear that their main arguments are about the 223 and 486 patents and the concept that R3 anticipated most of those claims. But the other four patents were broadly not about R3. And if you look carefully at the board decisions, which is all we have in the record, as far as I know, if you look carefully at the board decisions, what you'll see is arguments going both ways. We prevailed with respect to some legal arguments before the board. Ultimately, however, all of those claims are invalidated. But they had nothing to do with R3 or any other sort of obvious software that existed prior to our patent. So I think when the judge considered all of that and the totality of the circumstances, he was well within his discretion to say, look, this litigation was nothing special. It was a defeat for Wellogic, to be sure, but well within the normal bounds of litigation between two parties that have been fighting about important issues for many years. If the court has no further questions, I'll yield the balance of my time. Thank you, counsel. Mr. Lanier has some rebuttals on. Thank you, Your Honor. Your Honors, Mr. Melkonian started off by pointing out that SAP sued Wellogic in the patent case underlying this. Of no moment does this court's Homeland Housewares case confirms a DJ plaintiff can be a prevailing party entitled to recovery under 285. Mr. Melkonian then said it's important to emphasize that Wellogic actually prevailed. They sued Accenture, and they prevailed. But leaves out one critical thing that also was ignored by the district court, that in the decision confirming that they prevailed on various issues, the district judge, hearing that case, trying those facts, specifically distinguished SAP from Accenture. Wellogic's throughout this case specifically found. The German litigation is pending, I gather? The German litigation is pending. It's moved along since we updated the court and the record. I'll represent to the court that the German litigation has reached an outcome of what they call the first instance courts. SAP prevailed in defeating all of Wellogic's substantive claims, was awarded statutory fees, but not the full amount of damages we sought. Wellogic's is appealing the substantive determination, denying its claims against SAP, and we're appealing on the fees in Germany. It's a different set of fees, not what we're seeking here. And that's not, is that only patent claims, or also includes things like the claims on which Wellogic's prevailed against Accenture? Those are precisely the claims on which Wellogic's prevailed against Accenture. There are no patent claims. We had always said that the patent claims belonged in the U.S. because they weren't covered by the Net Weaver Foreign Selection Clause because the patent claims did not arise under the agreement that the tort and trade seeker claims did. And so, but the key point there is that the district judge hearing those facts did not even consider the fact that his colleague had actually found that SAP and Accenture were differently situated, something we don't hear about from Wellogic's. But I do want to turn back to R3 because it has consumed a lot of our discussion here. Appendix page nine. Exactly, Your Honor. That's exactly where I was going to go. That is a reference to this argument. Doesn't quite say, and by the way, the right, this is lines four to four and five. SAP's contentions that Wellogic should have known about SAP's prior art. That's a reference to this argument, although it doesn't expressly mention that the prior art of SAP is part of what you say was accused, maybe incorrectly. I believe that those words are correct, Your Honor, but I don't think that's the important, this court should give that sentence and the phrasing of it for two reasons. The first is that that sentence reflects nothing about the actual underlying facts. It's not just that Wellogic should have known that some versions of the software predated it. It should have known it was prior art, it was familiar with the product. Secondly, that sentence, which is the only very broad, high-level reference to the issue at all, betrays no understanding of this court's guidance. Again, in Kartner and many other cases, you don't accuse the prior art. That's not generally acceptable. This isn't evolving law here. I thought it was interesting, what should I make of the fact that in your application for fees, as is fairly common, you have one section about litigation positions completely meriless and then a separate section about unreasonable litigation conduct. At this point, about R3 does not appear in the first. That is, it's not one of your two points about why their position was objectively meritless. It's only one of the points made about why there's subjective bad faith. That's correct, Your Honor. That is how we present it, and I think that's, we could potentially have argued it in both. I think we emphasized it in subjective bad faith to emphasize that subjective bad faith, while not required but available to support a finding, was present in this case. But we did distinguish it that way. I see that my time is up. If there are no more questions, I'll yield. Thank you, counsel. We'll take the case under advisement.